# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Senior Judge Marcia S. Krieger

Civil Action No. 17-cv-00639-MSK-KMT

STEVEN WENRICH,

     Plaintiff,

v.

EMPOWERED MANAGEMENT SOLUTIONS LLC; and
RYAN MCCARTHY, Acting Secretary of the Army,[1]

     Defendants.

_____

## OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT
_____

**THIS MATTER** comes before the Court on 1) Defendant Empowered Management Solutions, LLC's ("EMS") Motion for Summary Judgment **(# 59)**, and Mr. Wenrich's response **(# 61)**; and 2) Defendant Ryan McCarthy's ("the Army") Motion for Summary Judgment **(# 60)**, Mr. Wenrich's response **(# 52)**, and the Army's reply **(# 64)**.

## FACTS

The Court summarizes the pertinent facts here and elaborates as necessary in its analysis. It views all evidentiary disputes in the light most favorable to the non-movant.

The U.S. Army contracts with private sector entities to provide for medical staffing at certain Army hospitals. In this case, the Army contracted with an entity called Luke & Associates to staff an Army hospital in Fort Carson, Colorado. In turn, Luke & Associates

_____

[1] The Court has *sua sponte* modified the caption of this action to reflect the current Acting Secretary of the Army.

subcontracted with Defendant EMS. EMS then retained the Plaintiff, Dr. Wenrich, to provide services at the hospital.

Dr. Wenrich worked the night shift at the hospital, during which time he was the only OB/GYN on duty. Dr. Wenrich suffers from diabetes and occasionally experiences instances of hypoglycemia, which can result in confusion, abnormal behavior, and loss of consciousness.

On February 15, 2015, staff nurses paged Dr. Wenrich to attend to a patient. Dr. Wenrich did not respond. The nurses investigated and found him unconscious in the call room. He was taken to the emergency room, found to be suffering from extremely low blood sugar, and treated with dextrose. He recovered and went home. Dr. Wenrich's supervisor, Dr. Anthony Sullivan, reported this incident (as well as a "less severe" one that had occurred "several months back, in which nurses detected "a slight change in [his] behavior," which resolved after he had something to eat) to a superior, in case it was necessary for the Army to notify Luke & Associates.[2]

Dr. Wenrich had a second hypoglycemic episode about a month later, on March 10, 2015. A patient in labor was in distress and nurses found Dr. Wenrich unable to perform an emergency C-section. The evidence as to his state is inconsistent – one report is that the nurses found Dr. Wenrich to exhibit an "altered mental state" as a result of low blood sugar and another account reports that he was asleep and "unresponsive." The nurses administered a glucose IV to Dr. Wenrich in order to revive him and raise his blood sugar. He apparently recovered and then completed his shift. Once again, there is a slight inconsistency in the evidence. One version of events report that he completed his shift "without further incident," while another version reports

_____

[2]    The superior responded that it was Dr. Wenrich's obligation to report the incident to his employer, EMS and that it was EMS' responsibility to ensure that Dr. Wenrich was adequately credentialed. The superior stated that Dr. Sullivan should advise if Dr. Wenrich's "health ever become[s] a concern that affects his clinical performance or direct patient care."

that he "remained visibly abnormal and slow in decision making during the caesarian section," but completed the procedure without harm.

In reporting this incident to his superiors, Dr. Sullivan stated that "This now appears to be a patient safety issue." Dr. Sullivan removed Dr. Wenrich from the night shift and placed him on the day shift where there would be other doctors available to cover. Dr. Wenrich testified, however, that he agreed not to come back to work until he "got the problem fixed." It appears that both parties understood that Dr. Wenrich would contact his endocrinologist and look into obtaining an insulin pump that would provide constant glucose monitoring.

Dr. Sullivan and other Army supervisors were also concerned about Dr. Wenrich's forthrightness and ability to self-assess because Dr. Wenrich did not promptly report the incidents to Dr. Sullivan. The team requested that an Army contracting official advise Luke & Associates of the incidents. In an email to Luke & Associates, the Army contracting official described the two incidents, noted that "patient safety is now a concern" and advised Luke & Associates that notification was made "so that appropriate corrective actions can be taken." In addition, the official asked that Luke & Associates "inform us on [your] plan to resolve the [Army's] concerns going forward." Luke & Associates responded that neither it nor EMS were "ever made aware by Dr. Wenrich of any medical issues that exist," and that it intended to investigate the matter. Luke & Associates inquired whether "it [is] your intention to remove Dr. Wenrich from the schedule." The contracting official replied that the hospital team agreed that "Dr. Wenrich should not practice at [the] hospital any longer, given his current health issues and inability to provide full scope of practice" and that they "recommended that Dr. Wenrich be removed from delivering care."

According to Charissa Power, EMS' President, Luke & Associates then contacted EMS and advised that the Army would no longer allow Dr. Wenrich to work at the hospital. Ms. Power wrote to Mr. Wenrich on March 13, 2015, informing him that "we have been formally notified by [the hospital's] Contracting Office that . . . your position as an OB/GYN physician has been terminated." Although the letter thanked Dr. Wenrich for his service and wished him "the best in all your future endeavors," Ms. Powers states that EMS "attempted to provide [Dr. Wenrich] with alternate employment opportunities, but he refused them all because they were not located in or near Colorado Springs."

Dr. Wenrich commenced this action in which he brings a single claim for disability discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* against EMS and the Army. Both Defendants now move for summary judgment. EMS' motion **(# 59)** argues that Dr. Wenrich cannot show that EMS took any adverse employment action against him, as it was the Army and Luke & Associates that terminated Dr. Wenrich's ability to work at the hospital. The Army's motion **(# 60)** argues that: (i) Dr. Wenrich cannot bring a claim of employment discrimination against the Army under the Rehabilitation Act because he was an independent contractor, not an employee; (ii) that the Army's actions regarding Dr. Wenrich were not based on the fact of him having a disability but rather, were based on his failure to control his condition; (iii) that Dr. Wenrich was not an "otherwise qualified" individual because his condition posed a direct threat to the health and safety of others; and (iv) that Dr. Wenrich lacks standing to sue the Army because the Army is immune from claims for money damages and that injunctive relief restoring Dr. Wenrich to practice at the hospital is impossible because Dr. Wenrich has since surrendered his medical license.

## <u>ANALYSIS</u>

**A.  Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if

no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and

a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

If the movant has the burden of proof on a claim or defense, the movant must establish

every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P.

56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B.  The Army's motion**

1. Standing

Because the Army's standing argument implicates the Court's subject-matter jurisdiction, the Court turns to it first.  Among the components that a plaintiff must demonstrate in order to have standing to pursue a claim is that the injury the plaintiffs has suffered could be redressed by a favorable ruling.  *Food Marketing Inst. v. Argus Leader Media*, 139 S.Ct. 2356, 2362 (2019). Here, Dr. Wenrich's injury is the loss of his position at the hospital, and thus, the question presented is whether there is some remedy that the Court could impose against the Army that would redress that injury.

As to money damages, the Army points out that the provisions of the Rehabilitation Act at issue here do not waive the U.S. Government's sovereign immunity.  *Lane v. Pena*, 518 U.S. 187, 197 (1996) (cadet unlawfully terminated from Merchant Marine Academy because of his diabetes could not recover money damages under the Rehabilitation Act).  Thus, Dr. Wenrich will not be able to obtain an award of money damages against the Army.  Dr. Wenrich's summary judgment response appears to concede this point.

However, Dr. Wenrich argues that he can still recover "injunctive or equitable relief," in the form of "an order of reinstatement and back pay, or front pay in lieu of reinstatement."  As a general rule, awards of back pay (and, where appropriate, front pay) are treated as forms of equitable, not monetary, relief.  *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).  In *Bowen*, the Supreme Court noted that sovereign immunity prevented awards of monetary relief against a sovereign, but held that certain forms of equitable relief  could be viewed as "specific relief" (that is, awards reflecting the undoing of a wrongful act), rather than "substitute relief" (that is, "relief that substitutes for that which ought to have been done") that would be akin to an award of money damages.  487 U.S. at 910.  There, the relief that the plaintiff sought – payments for Medicaid reimbursements that the state had improperly withheld – was "specific" relief because it is the very property the plaintiff would have had but for the unlawful denial.  The Supreme Court found, in those circumstances, that awards of specific relief were not "money damages" and thus would fall within the waiver of sovereign immunity contained within the Administrative Procedure Act, 5 U.S.C. § 702 (waiving sovereign immunity for "relief other than money damages").  *Id.*

The Army relies on *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999), in which a subcontractor on a federal project went unpaid by the general contractor and sought to recoup payment by claiming an equitable lien on federal funds to be disbursed to the general contractor on the project.  The Court in *Blue Fox* made clear that *Bowen*'s teaching was not that simply characterizing relief as "equitable" is enough to bring it within the APA's waiver of sovereign immunity; rather, the question to be asked is whether the relief in question is "specific" or "substitute."  525 U.S. at 262.  The Court held that an equitable lien, although equitable in nature, was a form of "substitute" relief because it "does not give the plaintiff the

very thing to which he was entitled" (*i.e.* a payment from the general contractor itself).  In these circumstances, the subcontractor's claimed lien, although equitable, was "substitute relief" akin to money damages and thus barred by sovereign immunity.  *Id.* at 263.

Thus, the question presented is whether equitable relief such as back pay is "specific" or "substitute" relief.  It is generally understood that "back pay constitutes the very thing that the plaintiff would have received but-for the defendant's illegal action."  *Hubbard v. E.P.A.*, 949 F.2d 453, 462 (D.C. Cir. 1991). Therefore, back pay is "specific" rather than "substitute" relief. Accordingly, the Court is satisfied that an award of back pay in favor of Dr. Wenrich and against the Army[3] would be a remedy that falls within the APA's waiver of sovereign immunity in accordance with the reasoning in *Bowen*.  Accordingly, Dr. Wenrich's claim against the Army is capable of redress and Dr. Wenrich has standing to pursue it.

2. <u>Sufficiency of claim</u>

The Army raises two major arguments in support of its motion for summary judgment: (i) that Dr. Wenrich cannot show that the Army controlled his employment; and (ii) that even if it did, Dr. Wenrich cannot show that the Army discriminated against him because of his disability. Because the Court finds merit in the second argument, it bypasses the first, assuming for purposes of this motion that the Army was Dr. Wenrich's direct employer.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be . . . subjected to discrimination under any

---

[3]        There are, to be certain, several additional hurdles that Dr. Wenrich would have to leap in order to obtain a remedy of back pay directly against the Army.  Among others, he would have to pierce the multi-layered contracting structure that vests primary personnel decisionmaking in EMS and Luke & Associates, rather than in the Army.  Those hurdles are closely intertwined with the merits of the case and are beyond the scope of the issues argued by the Army here with regard to standing.

program or activity" conducted by a federal agency.  29 U.S.C. § 794(a).  To establish a claim for disability discrimination under the Rehabilitation Act, Dr. Wenrich must show that he: (i) is disabled as defined by the Act; (ii) there is a program that receives federal financial assistance; (iii) that he is "otherwise qualified" to participate in that program; and (iv) that the program discriminated against him because of his disability.  *See Havens v. Colo. Dept. of Corrections*, 897 F.3d 1250, 1262 (10th Cir. 2018). There is no dispute that Dr. Wenrich can satisfy the first two elements of this test – that his diabetes constitutes a disability[4] and that the Army is a federally-funded agency -- but his ability to satisfy the latter two elements is not so clear.

The Court elects to address the final element – whether the evidence creates a triable question as to whether the Army discriminated against Dr. Wenrich because of his disability – diabetes.  In analyzing this element, the Court applies the familiar *McDonnell-Douglas* framework used in many employment discrimination claims: the Court considers whether Dr. Wenrich has made a *prima facie* showing that his termination was because of his diabetes, the Army must proffer a legitimate and non-discriminatory reason for its action, and Dr. Wenrich must show that the Army's reason is a pretext for disability discrimination.  *See Cummings v. Norton*, 393 F.3d 1186, 1189 & n. 1 (10th Cir. 2005).

It is not seriously disputed that the events precipitating Dr. Wenrich's termination were his two hypoglycemic events in February and March 2015.  According to the Army's expert, Dr. Boris Draznin, "hypoglycemia is not caused by diabetes," but rather, it is a condition that can result when a diabetic individual takes too much supplemental insulin to counteract the effects of diabetes.  Nevertheless, there is a clear and direct connection between Dr. Wenrich's diabetic

--------------------------------

[4]     *But see e.g. Brady v. Potter*, 273 Fed.Appx. 498, 502-04 (6th Cir. 2008) (finding otherwise-controlled Type I diabetes to not be a disability for purposes of the Rehabilitation Act).

condition and the hypoglycemic events he experienced in 2015, such that one can reasonably say that the Army's evaluation of those events necessarily entailed consideration of Dr. Wenrich's diabetes. Any doubt on that point is dispelled by Dr. Sullivan's February 19, 2015 e-mail to his superiors, in which he mentions Dr. Wenrich's February hypoglycemic incident and notes that it is "the only diabetes related incident[ ] I am aware of." Thus, there is sufficient evidence that the Army associated the hypoglycemic events with Dr. Wenrich's diabetes, such that Dr. Wenrich has made a *prima facie* showing that the Army's consideration of one entailed consideration of the other.

The Army has discharged its burden of articulating a legitimate, non-discriminatory reason for Dr. Wenrich's termination. The Army's evidence reveals two separate but related explanations: (i) that Dr. Wenrich failed to control his diabetes, thereby preventing him from fulfilling the Army's legitimate expectations for his work performance, and (ii) that Dr. Wenrich had not disclosed the incidents to either Dr. Sullivan or to Luke & Associates and EMS, causing Dr. Sullivan and the Army to "believe that we could [not] rely on his future self-assessments." Both justifications, Dr. Sullivan's affidavit asserts, implicate the Army's concerns for patient safety. The Army also points out that Dr. Sullivan was "aware for many years that Dr. Wenrich suffers from diabetes," and that he has worked with "numerous physicians who suffer from diabetes who are able to safely perform their jobs." These facts, the Army contends, further establish that it was Dr. Wenrich's uncontrolled hypoglycemic incidents, not the mere fact of his diabetes, that justified terminating his services.

As the Army notes, several courts have considered whether an employer's decision to terminate the employment of a diabetic employee based on hypoglycemic incidents experienced while on-duty constitutes disability discrimination under the Americans With Disabilities Act.

Numerous cases conclude that a diabetic employee's failure to control their disease is a separate and distinct justification for termination, such that the termination is not "because of" the diabetes itself. In *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 665-66 (7th Cir. 1995), the defendant hired the plaintiff as a police officer, knowing that the plaintiff was a diabetic. When the plaintiff had a hypoglycemic incident while driving his patrol car, the defendant terminated his employment immediately. The plaintiff sued, claiming disability discrimination under the ADA, but the 7th Circuit affirmed the dismissal of his claim, finding that the proximate cause of his termination was not the fact that he had diabetes, but rather, "his failure to monitor his condition." 65 F.3d at 666. In *Burroughs v. City of Springfield*, 163 F.3d 505, 508 (8th Cir. 1998), on effectively the same facts (except the plaintiff suffered two hypoglycemic incidents on duty before he was terminated), the 8th Circuit affirmed the dismissal of a disability discrimination claim for the same reasons.

Dr. Wenrich does not dispute the line of authority established by cases like *Siefken* and *Burroughs*, but he argues that his case is factually distinguishable. Dr. Wenrich primarily relies on the fact that Dr. Sullivan responded to the March 2015 incident by transferring Dr. Wenrich to the day shift until he could obtain an insulin pump, which he argues indicate that the Army believed that Dr. Wenrich could ultimately be able to "provide patient care to the level expected by the Army."

This argument is without merit. It is clear that Dr. Sullivan transferred Dr. Wenrich to the day shift not because he felt that Dr. Wenrich could still reliably provide patient care, but because the day shift had "copious physician back-up in house" if, during a critical moment, Dr.

Wenrich suffered another incident.[5]  Thus, the record reflects that the transfer to the day shift was simply a stopgap measure, allowing the Army to ensure that Dr. Wenrich would not cause any harm while the Army considered how to permanently address his situation.

That leaves the question of the insulin pump.  Dr. Wenrich is correct that, in his March 11, 2015 e-mail, Dr. Sullivan referred to a "long-term plan" for Dr. Wenrich's "condition," consisting of him contacting his endocrinologist to obtain "an insulin pump that provides continuous glucose monitoring."  Construing that evidence in the light most favorable to Dr. Wenrich, one could conclude that Dr. Sullivan thought that risks to patient safety could be ameliorated if Dr. Wenrich was placed on an insulin pump.  But the record reflects that this was Dr. Sullivan's opinion as of 8:20 a.m. on March 11.  Later that day, Dr. Sullivan and other supervisory staff apparently reflected on Dr. Wenrich's failure to report either of the incidents and communicated those facts to Luke & Associates and EMS.  As Dr. Sullivan's affidavit explains, Dr. Wenrich's lack of forthrightness added an additional, troubling layer to the situation, making it such that the Army was no longer convinced that it could rely on Dr. Wenrich's own self-assessment of his condition.  In such circumstances, whether Dr. Wenrich obtained an insulin pump or not was somewhat beside the point; the Army had lost confidence in his candor and his ability to self-assess.  Dr. Wenrich does not dispute the fact that he never disclosed the hypoglycemic incidents to Dr. Sullivan, Luke & Associates, or EMS.  Accordingly, he has failed to demonstrate a genuine issue of material fact that would show that <u>both</u> reasons tendered by the Army for his termination are a pretext for discrimination.

Thus, the Army is entitled to summary judgment on Dr. Wenrich's claim against it.

---

[5]     The Court does not understand Dr. Wenrich to suggest that having other physicians prepared to cover for him would constitute a reasonable accommodation that the Army should have made for him, and if he did, the Court would reject that contention.

### C.  EMS' motion

The preceding discussion controls the outcome of Dr. Wenrich's claim against EMS.
The crux of Dr. Wenrich's response to EMS' motion for summary judgment is that EMS knew
of, and is therefore jointly responsible for, any discriminatory motivations held by the Army in
directing Dr. Wenrich's termination.  Because the Court has found that there is no genuine
dispute as to whether the Army's motivations were discriminatory, Dr. Wenrich's claims against
EMS fail.  Dr. Wenrich has not alleged that EMS harbored any independent discriminatory
animus towards him because of his disability.

EMS also makes a passing argument that, consistent with its status as Dr. Wenrich's
employer, that it attempted to find alternative assignments for Dr. Wenrich after the Army
terminated his assignment at the hospital.  EMS contends that Dr. Wenrich refused to consider
assignments outside of Colorado Springs, and that because it did not have any available work
within that area, it ultimately terminated its employment agreement with Dr. Wenrich.  It is not
clear whether Dr. Wenrich is suggesting that these actions constitute a separate basis for a
Rehabilitation Act claim against EMS, but to the extent it does, the Court finds that EMS is
entitled to summary judgment.

EMS has produced a series of e-mails to Dr. Wenrich from Beverly Power, an EMS
official, in and around late March 2015.  Ms. Power informs Dr. Wenrich that EMS is "still
looking for an opportunity for you.  SA" – presumably, San Antonio – "would be good as well."
Later, Ms. Power informs Dr. Wenrich that EMS "[w]ill continue to try to identify a position for
you in San Antonio, Houston, Dallas, or even El Paso at Fort Bliss."  In contrast, Dr. Wenrich
has not produced any evidence to dispute EMS' contention that he refused to consider any

alternative reassignments. In such circumstances, Dr. Wenrich has not demonstrated a triable issue of fact as to whether EMS discriminated against him because of his disability.

## CONCLUSION

For the foregoing reasons, EMS' Motion for Summary Judgment (**# 59**) and the Army's Motion for Summary Judgment (**# 60**) are **GRANTED**. The Clerk of the Court shall enter judgment in favor of both Defendants on all claims and thereafter close this case.

Dated this 3rd day of August, 2019.

**BY THE COURT:**

_____
Marcia S. Krieger
Senior United States District Judge